UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

WILLIAM R. RAY,

               Plaintiff,

vs.                           Case No. 3:15-cv-1486-J-39PDB

CORIZON MEDICAL GROUP, et al.,

               Defendants.

_____

**ORDER**

**I. Status**

On December 16, 2015, Plaintiff William R. Ray, an inmate of the Florida Department of Corrections, filed a civil rights Complaint (Doc. 1) pursuant to 42 U.S.C. § 1983. He is proceeding on a Second Amended Complaint (Second Amended Complaint) (Doc. 25).[1] Defendants Corizon, LLC, Anthony Hale, and Dr. Denis Vilchez's Motion for Summary Judgment (Motion) (Doc. 62) is pending before the Court.[2] Plaintiff filed a Response to Defendants' Motion for Summary Judgment (Response) (Doc. 65). See Summary Judgment Notice (Doc. 63).

Plaintiff raises one claim, a claim of deliberate indifference to serious medical needs. Second Amended Complaint at 5. He

_____

[1] The Court references the page numbers assigned by the electronic filing system.

[2] The Court refers to Corizon Medical Group (Corizon, LLC) as Corizon, the Head Healthcare Officer as Dr. Vilchez, and R.N. Hale as Defendant Hale.

claims Defendants have been deliberately indifferent to his serious medical needs, causing Plaintiff serious medial problems and excruciating pain and discomfort, and resulting in kidney damage and continued infections. Id. As relief, Plaintiff seeks declaratory relief as well as compensatory and punitive damages. Id. at 6-7. He also seeks costs and attorney's fees, and any other just and equitable relief that the Court deems necessary. Id. at 7.

The alleged facts supporting the Amended Complaint are set forth at pages 5-6. Plaintiff alleges that while confined at Suwannee Correctional Institution (SCI), Dr. Vilchez and nurse Hale denied him proper medical care for an illness diagnosed by the CDC (Centers for Disease Control and Prevention), after receiving results from a laboratory, showing a kidney infection, that continues to date, but diagnosed on January 25, 2016.[3] Id. at 5. Plaintiff asserts that the laboratory results showing the kidney infection were hidden in Defendant Hale's office until Plaintiff repeatedly requested a sick call visit. Id. Plaintiff asserts Defendant Hale purposefully lost sick call requests and threatened Plaintiff. Id.

---

[3] Plaintiff, in response to an interrogatory, clarifies he is complaining about the lack of treatment for an E coli infection, not a kidney infection, and for Juvenile Rheumatoid Arthritis (JRA). (Doc. 62-2 at 2). As such, the focus of the Court's review will be on Plaintiff's claim of deliberate indifference to his serious medical needs: an E coli infection and JRA.

Plaintiff states he filed complaints with the Head Medical Director, many of which came up missing. Id. at 6. These complaints made the Medical Director aware of Plaintiff's medical problems as well as the discontinuation of treatment for JRA. Id. Plaintiff contends, due to the denial of proper medical treatment, he has suffered from vomiting, fever, blurred vision, and dull and throbbing pain. Id. He also claims, due to Defendants' neglect, he had to be hospitalized in an outside hospital and in a state prison medical institution. Id.

Plaintiff alleges he is suffering from a degenerative knee and hand conditions, causing great pain and difficulty walking. Id. He also complains of stomach pain and abdominal distress caused by a kidney infection. Id. He states he suffers from fevers in excess of 100 degrees caused by infections, as well as nausea, shakes, headaches, and a depressed appetite. Id. Plaintiff alleges Corizon and Dr. Vilchez had "official knowledge of these issues as well as being giving [sic] knowledge of the fact that R.N. Hale [sic] kept running Plaintiff off when he showed up to medical c[r]ying in pain for assistance but received little or none." Id.

## II. Summary Judgment Standard

"Summary judgment is appropriate only if 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Moton v.

Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). "If the moving party meets this burden, 'the nonmoving party must present evidence beyond the pleadings showing that a reasonable jury could find in its favor.'" Ekokotu v. Federal Exp. Corp., 408 F. App'x 331, 333 (11th Cir.) (per curiam) (quoting Fickling v. United States, 507 F.3d 1302, 1304 (11th Cir. 2007)), cert. denied, 565 U.S. 944 (2011).

### III. Defendants' Motion

Defendants, in their Motion, reiterate that Plaintiff alleges Defendants failed to provide timely treatment for an E. coli urinary tract infection (UTI) and discontinued Plaintiff's treatment for JRA. Motion at 1. Defendants assert they are entitled to summary judgment with respect to this Eighth Amendment claim of deliberate indifference to a serious medical need. Id. at 2.

Defendant Hale contends, as a Licensed Practical Nurse (LPN) at the time of the alleged events, he "had no role in formulating treatment plans or prescribing medications." Id. at 3. He describes his medical role as being limited to taking patients' subjective complaints and objective vital signs, recording information in the medical record, distributing medications as ordered by medical providers, and accomplishing tasks such as blood draws or other lab work. Id. at 3-4. He asserts he played no role whatsoever in Plaintiff's JRA treatment, and he did not hide any

4

lab results in his office as they would be contained in the medical record. Id. at 4.

Generally, Defendants describe Plaintiff as being in very poor health, with chronic medical issues, and in a wheelchair. Id. Defendants note that back on September 10, 2014, Plaintiff had an ultrasound of the abdomen that showed a simple cyst in the left kidney, but was otherwise unremarkable. Id. Defendants also point out that on May 14, 2015, Plaintiff was seen for a consult for therapeutic shoes needed to alleviate discomfort and pain secondary to his JRA, and signed a receipt for the shoes. Id. Plaintiff had a wheelchair pass with a cushion. Id. at 5. Also of import, Defendants note, on June 4, 2015, Plaintiff refused a hemoccults [sic] test at his annual health screening, and on June 10, 2015, he refused his labs. Id.

Of importance to this case, Defendants describe Plaintiff's interaction with his staff health care provider at the institution, Dr. Alexis Figueroa. Id. Plaintiff saw Dr. Figueroa in the chronic care clinic on October 30, 2015, and the doctor diagnosed hypertension, dyslipidemia, and diabetes, all under fair control, as well as JRA, under poor control. Id. Dr. Figueroa renewed Plaintiff's medications (Zocor, Protonix, Meformin, Glipizide, Tregretol, and Benadryl) and added sunblock and Triamcinolone (Doc. 62-1 at 9). Motion at 5.

Dr. Figueroa saw Plaintiff on December 4, 2015, for removal of a toenail. _Id_. Plaintiff complained of urinary dribbling and osteoarthritis. _Id_. At that time, Plaintiff was taking Methotrexate, a medication to treat his JRA, and Indocin, a non-steroidal anti-inflammatory drug for treatment of pain. _Id_.

Importantly, Dr. Figueroa prescribed Ciprofloxacin (Cipro), an antibiotic used to treat bacterial infections, on the date Plaintiff saw a nurse complaining of feeling cold and running a temperature of 103 degrees. _Id_. at 6. The nurse provided Plaintiff with Acetaminophen. _Id_. Thereafter, on January 22 and January 23, 2016, Plaintiff was seen for hyperglycemia (high blood sugar), exhibiting nausea and vomiting. _Id_. Dr. Figueroa ordered IV insulin, admission to the infirmary for 23-hour observation, and medication. _Id_.

Plaintiff had labs on January 25, 2016, and a urine test showed Escherichia coli (E. coli), a bacteria, in the urine, presenting as a UTI.[4] _Id_. Dr. Figueroa reviewed the lab results on February 1, 2016, as exhibited by his stamp on the results. _Id_. The lab report states that this type of E. coli could be resistant to penicillin and other antibiotics. _Id_.

Dr. Figueroa, while noting the diagnosis of JRA, discontinued Tegretol (a medication used to treat seizures and nerve pain). _Id_.

---

[4] Again, although Plaintiff alleges he was diagnosed with a kidney infection on that date, he was diagnosed with a UTI.

at 7. Plaintiff submitted sick call requests on February 25, 2016 and February 29, 2016, complaining of a variety of ailments, including suspected complications of diabetes and a possible infection. Id. A nurse marked the medical request emergent on March 1, 2016. Id. Plaintiff saw a nurse on March 3, 2016, and the nurse noted a history of recurrent UTI's and Plaintiff's elevated blood sugar. Id. Plaintiff was given Ibuprofen and instructed to continue any antibiotics, if applicable. Id. Plaintiff voiced related complaints to a nurse on March 5, 2016, and said he had not started an antibiotic. Id. After checking Plaintiff's visual acuity and blood sugar, the nurse sent Plaintiff to the pharmacy to obtain an antibiotic.[5] Id.

Defendants note that on March 10, 2016, Dr. Figueroa saw Plaintiff in the chronic care clinic. Id. Dr. Figueroa ordered medications and labs and educated Plaintiff regarding diet, exercise and compliance. Id. "On April 1, 2016, Plaintiff saw Dr. Figueroa for a follow up for his UTI after completing his medications." Id. Plaintiff complained of dysuria (painful or difficult urination), and Dr. Figueroa ordered labs, including a

---

[5] Defendants aver Plaintiff apparently started antibiotics in early March 2016. Motion at 7. Defendants state that in January 25, 2016, the UTI infection was asymptomatic, and antibiotics were not provided until the symptoms associated with the infection emerged. Id. at 8. They contend that due to Plaintiff's age and medical condition, including suffering from diabetes, it was medically inappropriate to treat the UTI prior to the emergence of the symptoms of infection. Id. at 8.

urinalysis. Id. The urinalysis of April 4, 2016 showed the presence of E. coli. Id. Plaintiff saw Dr. Figueroa again on April 7, 2016, and he ordered Gentamycin, an injection to treat bacterial infections, additional labs, and a urinalysis. Id. at 8-9. Defendant Hale began the IV of Gentamycin. Id. at 9. Dr. Figueroa, on April 8, 2016, noted that due to Plaintiff's history of allergies (he is allergic to penicillin) and the related signs and symptoms of a UTI, Plaintiff would continue to receive IV treatment until he received his oral medications. Id.

Plaintiff saw Dr. Figueroa for his recurring UTI on April 29, 2016. Id. The urine culture registered positive for E. coli. Id. Dr. Figueroa noted the UTI was sensitive to Gentamycin and Plaintiff was allergic to penicillin. Id. Dr. Figueroa placed Plaintiff on Gentamycin again, for three days. Id. After these injections, Dr. Figueroa admitted Plaintiff to the infirmary for 23-hour observation. Id. Dr. Figueroa prescribed Cipro and Flagyl (Metronidazole), another antibiotic, for seven days. Id. He also ordered a Toradol (Ketorolac Tromethamine, a non-steroidal anti-inflammatory drug, used to treat pain and inflammation) injection and Gentamycin. Id.

Plaintiff had labs taken on May 8, 2016, and a urine culture showed no growth, and then had additional labs taken on May 18, 2016. Id. The nurse saw Plaintiff on May 19, 2016, for non-emergent vomiting and diarrhea. Id. Plaintiff transferred from

SCI to Northwest Florida Reception Center Annex on May 23, 2016. Id.

Defendant Dr. Vilchez, a medical doctor employed by Corizon, states he served as the Medical Director at SCI, and as such, he "had no role in Plaintiff's medical treatment or care." Id. at 10. Dr. Vilchez maintains he never saw Plaintiff for an appointment or examination, never ordered medications, never reviewed his records, and never oversaw or dictated Plaintiff's care. Id. Dr. Vilchez also asserts he never approved or denied medical care for Plaintiff as "he had nothing to do with treatment decision regarding those conditions." Id.

Additionally, Dr. Vilchez states he never read or reviewed inmate grievances. Id. He contends his signature is on the grievance only because his signature was required by the FDOC. Id. He explains that the Health Services Administrator (HSA) actually investigates inmates' medical complaints, provides relevant responses, and the responses are signed by Dr. Vilchez, although he "never reviewed or read any request for medical care, complaint, or grievance from Plaintiff." Id. at 11.

Defendant Corizon, in the Motion, states that because it is a corporation, liability will attach only if an official unconstitutional policy or custom is adopted by the corporation and it caused a deprivation of Plaintiff's constitutional rights. Id. at 15-16. In this regard, Plaintiff must identify a corporate

9

policy (a decision officially adopted by the corporation or created by an official with the rank to be acting on behalf of the corporation) or custom (a practice that is so settled and permanent it takes on the force of law) that caused injury. <u>Id</u>. A persistent and widespread practice may evince a policy or custom. <u>Id</u>.

## IV. Plaintiff's Response

Plaintiff, in his Response, states Defendants were deliberately indifferent to his serious medical needs as evidenced by their discontinuing his treatment of JRA, including Methotrexate injections, simply to deflect costs. Response at 1-2. He also complains he was not sent to a rheumatologist regarding his rheumatic diseases. <u>Id</u>. at 2. Plaintiff maintains he was not promptly informed he had an E. coli infection, he was placed on inappropriate medications for this UTI infection, and the lab results were not in his medical records on March 3, 2016. <u>Id</u>. at 3-4. Plaintiff states he suffered from January 28, 2016, until March 3, 2016, "as a result of such poor medical attention." <u>Id</u>. at 4. He also claims he suffered from January 31, 2016, up until June 2, 2016, and opines he should have been hospitalized at the outset of his illness. <u>Id</u>. at 4-5.

Plaintiff, in his Response, contends Defendant Vilchez recklessly disregarded his grievance concerning deficient medical care, and knowingly acquiesced in the unconstitutional behavior of

his subordinates, causing Plaintiff to suffer in pain from the E. coli infection and JRA. Id. at 8, 11, 14. Plaintiff suggests that the custom and practice of signing grievances simply because it is required by the FDOC is a custom and practice only adopted at SCI, and not by the FDOC. Id. at 16, 20. Plaintiff also contends Corizon let the E. coli infection fester until it became almost untreatable, causing Plaintiff's eventual hospitalization for the out-of-control UTI and kidney problem. Id. at 21.

Plaintiff argues it was inexcusable for Defendants to wait so long to treat him for the E. coli infection, waiting from January 28, 2016, to March 3, 2016 to start treatment. Id. at 15. Plaintiff notes Defendants have admitted that they became aware of the E. coli infection on or around February 28, 2016 [sic], and treatment began on March 3, 2016. Id. at 22. Plaintiff states: "[t]his of itself is a material fact that is not in controversy and thus establishing a material fact for purposes of Plaintiff's lawsuit." Id.

## V. The Eighth Amendment

In order to state a claim under 42 U.S.C. § 1983, a plaintiff must allege that (1) the defendant deprived him of a right secured under the United States Constitution or federal law, and (2) such deprivation occurred under color of state law. Salvato v. Miley, 790 F.3d 1286, 1295 (11th Cir. 2015); Bingham v. Thomas, 654 F.3d 1171, 1175 (11th Cir. 2011) (per curiam) (citation omitted);

<u>Richardson v. Johnson</u>, 598 F.3d 734, 737 (11th Cir. 2010) (per curiam) (citations omitted).

To establish an Eighth Amendment violation, there are particular requirements that must be met. The Eleventh Circuit addressed the requirements to establish an Eighth Amendment claim concerning the deprivation of medical care:

> The Eighth Amendment's prohibition against "cruel and unusual punishments" protects a prisoner from "deliberate indifference to serious medical needs." <u>Estelle v. Gamble</u>, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). To state a claim of unconstitutionally inadequate medical treatment, a prisoner must establish "an objectively serious [medical] need, an objectively insufficient response to that need, subjective awareness of facts signaling the need, and an actual inference of required action from those facts." <u>Taylor v. Adams</u>, 221 F.3d 1254, 1258 (11th Cir. 2000).

<u>Kuhne v. Fla. Dep't of Corr.</u>, 745 F.3d 1091, 1094 (11th Cir. 2014).

"A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.' In the alternative, a serious medical need is determined by whether a delay in treating the need worsens the condition." <u>Mann v. Taser Int'l, Inc.</u>, 588 F.3d 1291, 1307 (11th Cir. 2009) (quoting <u>Hill v. Dekalb Reg'l Youth Det. Ctr.</u>, 40 F.3d 1176, 1187 (11th Cir. 1994)).

To demonstrate deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and a subjective

inquiry. See Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004) (citation omitted). This is not an easy task. First, he must satisfy the objective component by showing that he had a serious medical need, Goebert v. Lee Cty., 510 F.3d 1312, 1326 (11th Cir. 2007), and then, he must satisfy the subjective component, requiring the plaintiff to adequately present an allegation "that the prison official, at a minimum, acted with a state of mind that constituted deliberate indifference." Richardson, 598 F.3d at 737. See McLeod v. Sec'y, Fla. Dep't of Corr., No. 15-10851, 2017 WL 541398, at *2 (11th Cir. Feb. 10, 2017) (per curiam) (listing the three components of deliberate indifference, including (1) the official's subjective knowledge of a risk of serious harm; (2) the official's disregard of that risk; and (3) conduct that is more than mere negligence); Melton v. Abston, 841 F.3d 1207, 1223 n.2 (11th Cir. 2016) (per curiam) (disagreeing with an Eleventh Circuit panel decision stating a claim of deliberate indifference requires proof of more than gross negligence).

It is important to recognize,

> "medical care which is so cursory as to amount
> to no treatment at all may amount to
> deliberate indifference." Mandel v. Doe, 888
> F.2d 783, 789 (11th Cir. 1989) (citations
> omitted). However, medical treatment violates
> the Constitution only when it is "so grossly
> incompetent, inadequate, or excessive as to
> shock the conscience or to be intolerable to
> fundamental fairness." Rogers v. Evans, 792

13

F.2d 1052, 1058 (11th Cir. 1986) (citation omitted).

Nam Dang, by and through Vina Dang v. Sheriff, Seminole Cty. Fla., 871 F.3d 1272, 1280 (11th Cir. 2017) (also referencing the requirement of proof of more than mere negligence, not gross negligence).

Therefore, in order to establish an Eighth Amendment violation, Plaintiff must have had an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need and an actual inference of required action from the facts presented. Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000), cert. denied, 531 U.S. 1077 (2001). Of import, in the prison context, the Court has to distinguish between matters of professional medical judgment and evidence of disputed facts. Beard v. Banks, 548 U.S. 521, 530 (2006). If it is a matter of professional judgment, for example a decision not to pursue a particular course of diagnosis or treatment, it does not represent cruel and unusual punishment. Estelle v. Gamble, 429 U.S. 97, 107-108 (1976). Moreover, a dispute over adequacy of treatment sounds in tort law, not constitutional law.

With regard to Plaintiff's claim against Corizon, it is clear that private contractors who provide medical care for prisons act under color of state law for purposes of section 1983 litigation; however, the contractor cannot be held liable on a respondeat

superior or vicarious liability basis. <u>Monell v. Dep't of Soc. Serv.</u>, 436 U.S. 658 (1978). "Congress did not intend to create liability under § 1983 unless action pursuant to an official policy or custom caused a constitutional tort." <u>Id</u>. at 691.

With regard to the question of a Corizon policy,

> "[a] policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." <u>Sewell v. Town of Lake Hamilton</u>, 117 F.3d 488, 489 (11th Cir. 1997). A custom is an unwritten practice that is applied consistently enough to have the same effect as a policy with the force of law. <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 127, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988). Demonstrating a policy or custom requires "show[ing] a persistent and wide-spread practice." <u>Depew v. City of St. Mary's, Ga.</u>, 787 F.2d 1496, 1499 (11th Cir. 1986).

<u>Goebert v. Lee Cnty.</u>, 510 F.3d at 1332. Also with respect to causation, if a defendant is the final authority on policy, "then a causal link would exist sufficient for potential liability under section 1983." <u>Howell v. Evans</u>, 922 F.2d 712, 724 (11th Cir. 1991), <u>opinion</u> <u>reinstated</u> <u>by</u> <u>Howell v. Burden</u>, 12 F.3d 190 (11th Cir. 1994).

## VI. Conclusions

Apparently, Defendants agree Plaintiff presented a serious medical need in the Second Amended Complaint. Defendants do, however, contest Plaintiff's assertion of deliberate indifference to that need.

The medical record demonstrates, in pertinent part, the following. Although Plaintiff was diagnosed with a cyst on his left kidney on September 10, 2014, he was not diagnosed with a kidney infection. (Doc. 62-1 at 3). On December 4, 2015, Plaintiff was on Methotrexate, a medication used to treat rheumatoid arthritis, and Indocin, a non-steroidal anti-inflammatory drug used to relieve pain, swelling and joint stiffness caused by arthritis. Id. at 10.

Of note, on December 28, 2015, Dr. Figueroa prescribed Clindamycin (X10 days), an antibiotic used in the treatment of bacterial infections; Ibuprofen (X10 days), a non-steroidal anti-inflammatory drug used for treating pain, fever, and inflammation; and Rocephin (X1 day), another antibiotic used to treat bacterial infections. Id. at 13. On January 5, 2016, he prescribed Naproxen (X30 days), a non-steroidal anti-inflammatory drug that relieves pain, fever, swelling, and stiffness, and Clindamycin (X 10 days). Id.

Thereafter, on January 20, 2016, Plaintiff exhibited a 103 degree fever, was seen by a J. Heilig, RN, and given Acetaminophen, a pain and fever reliever. Id. at 11-12. The nurse notified Dr. Figueroa, who immediately prescribed Cipro (X7 days), an antibiotic. Id. at 13. When Plaintiff exhibited blood sugar issues, the Diabetes Protocol, dated January 22, 2016, shows the nurse notified Dr. Figueroa, and he directed insulin be provided

through an intravenous drip, and again, on January 23, 2016, when Plaintiff exhibited nausea and vomiting and elevated blood sugar, Dr. Figueroa directed insulin be provided in the same manner. Id. at 14-17.

The record demonstrates Plaintiff was placed under 23-hour observation due to vomiting blood and high blood sugar. Id. at 21. Dr. Figueroa ordered labs on January 23, 2016. Id. Vomiting ceased, and the nurse instructed Plaintiff on diet and medical compliance. Id. at 21-22.

The BioReference Laboratories sent the January 28, 2016 Final Report lab results to Dr. Figueroa, and he initialed the report on February 1, 2016, as evidenced by the stamp and writing on the document. Id. at 24-26. It reported E. coli in Plaintiff's urine, and listed a number of prescription drugs, including Gentamycin and Cipro. Id. at 25. The report noted that the E. coli "demonstrates the production of Extended-Spectrum Beta-Lactamase (ESBL) and may be clinically resistant to penicillins [sic], Cephalosporins and Aztreonam." Id. at 26. It is important to note that this report was received into Medical Records, SWCI, Annex, on February 2, 2016, the day after Dr. Figueroa received the report. Id. at 24-26.

On February 25, 2016, Plaintiff submitted a sick-call request, complaining of swollen lymph glands, night chills, fever, vision issues, symptoms referred to as possible complications of diabetes.

17

Id. at 31.  He said the onset of these symptoms started two weeks ago, or on and about February 13, 2016.  Id.  T. Crawford, LPN, marked this request routine.  Id.  Plaintiff submitted another sick-call request, on February 29, 2016, complaining of a drastic change in vision, blood sugar issues, a possible persistent infection, and a foreign object in his right ear.  Id. at 32.  He claimed the symptoms were ongoing for two days.  Id.  G. Morgan, LPN, marked this request emergent.  Id.

On March 3, 2016, M. Rios, RN, saw Plaintiff for urinary urgency.[6]  Id. at 33.  Plaintiff's blood sugar was elevated, his urine was cloudy and dark yellow/concentrated in appearance.  Id. The nurse immediately notified the clinician.  Id.  On March 5, 2016, Plaintiff told M. Allen-Beasley that he had not started on antibiotics, and in response Allen-Beasley directed Plaintiff to the pharmacy to obtain antibiotics available in the pharmacy.  Id. at 35.  On March 10, 2016, Plaintiff was seen in the Chronic Illness Clinic (CIC), and it was noted his hypertension was poor, but other assessments were good.  Id. at 36.  On March 10, 2016, Nurse M. Melanson, RN, stamped the January 28, 2016 lab report "Noted."  Id. at 27.

Importantly, Dr. Figueroa, on April 1, 2016, wrote as a follow up on the E. coli infection that Plaintiff had completed his

---

[6] In the Protocol, it is noted that Plaintiff is allergic to penicillin, referred to as "Pen."  (Doc. 62-1 at 33).

medication. <u>Id</u>. at 37. On that date, Dr. Figueroa reordered labs concerning the UTI. <u>Id</u>. Plaintiff continued to complain of diarrhea, and Dr. Figueroa prescribed Pain Off, a pain reliever, and Protonix, a proton pump inhibitor which decreases the amount of acid produced in the stomach. <u>Id</u>.

On April 7, 2016, prior to receiving the report back from the lab, Dr. Figueroa prescribed Gentamycin for the UTI. <u>Id</u>. at 39. Nurse Hale started the Gentamycin through an infusion, noting no adverse effects to Plaintiff, and Nurse Hancock, LPN, noted the Gentamycin infusion was complete. <u>Id</u>. at 40. Dr. Figueroa, on April 8, 2016, recorded, due to the patient's past history of allergies, plus the signs and symptoms of the UTI, the patient will continue with Gentamycin IVs until he gets oral medication. <u>Id</u>. He provided a one-day prescription. <u>Id</u>. at 41.

On April 12, 2016, labs were drawn and forwarded to the lab. <u>Id</u>. at 40. BioReference Laboratories provided the April 11, 2016 Final Report lab results to Dr. Figueroa, and he received the report on April 12, 2016. <u>Id</u>. at 38. The Medical Records department received the report on April 12, 2016 as well, as evidenced by the received stamp. <u>Id</u>. The report referenced E. coli found in Plaintiff's urine. <u>Id</u>.

Thereafter, on April 23, 2016, Dr. Figueroa prescribed Gentamycin for a period of seven days, and on April 27, 2016, he prescribed it for a period of three days. <u>Id</u>. at 41. On April 29,

2016, Dr. Figueroa saw Plaintiff, and the doctor noted Plaintiff's recurring UTI. Id. at 42. Dr. Figueroa recorded the E. coli was "sensitive" to Gentamycin and noted Plaintiff's allergy with respect to penicillin. Id. Injections of Gentamycin followed on April 29, 2016 and March 1, 2016. Id. at 43.

Dr. Figueroa ordered Plaintiff's placement in the infirmary for 23-hour observation for his UTI on May 7, 2016.[7] Id. at 45. Plaintiff's level of pain was 10 out of a scale of one to ten. Id. His blood pressure was elevated. Id. Dr. Figueroa prescribed Toradol, an anti-inflammatory drug to treat pain, and Flagyl and Cipro for a period of seven days. Id. at 44. The doctor also ordered an infusion of Gentamycin. Id. The nurses provided the Toradol injection, the doses of Flagyl and Cipro, and the infusion of Gentamycin on May 7, 2016. Id. at 45. Afterwards Plaintiff voiced no complaint of pain or discomfort. Id.

BioReference Laboratories provided Dr. Figueroa with the May 11, 2016 report, and he received it on May 13, 2016, as evidenced by his signature and stamp. Id. at 47. The urine culture showed no growth. Id. On May 19, 2016, Plaintiff exhibited what Nurse Hancock described as non-emergent vomiting and diarrhea. Id. at 50. Shortly thereafter, on May 23, 2016, Plaintiff transferred from SCI to North West Florida Reception Center. Id. at 52-53.

---

[7] The nurse collected a urine specimen on May 7, 2016, and sent it to the lab. (Doc. 62-1 at 46).

Notations on the Health Information Transfer/Arrival Summary include Plaintiff's confinement to a wheelchair, his allergies, medical prescriptions per orders, Plaintiff's participation in chronic clinics, his upcoming medical and mental health appointments, his need for special dietary and other passes, and the fact he is currently undergoing medical treatment. Id.

In reviewing the medical records, it is quite apparent that, Dr. Figueroa assessed and reassessed Plaintiff's health and adopted alternative treatment plans and medication. The record shows Plaintiff is being regularly, almost constantly, seen by medical professionals for a large number of ailments. Medical assessments have been undertaken, labs have been ordered, and different medications have been prescribed to alleviate pain and discomfort and to fight his chronic infections and ailments.

What initially stands out to this Court, is Plaintiff does not name Dr. Figueroa as a Defendant in this action. Based on the medical records, Dr. Figueroa, the treating physician at SCI, constantly provided Plaintiff with medical care, ordering various prescriptions and infusions to fight an aggressive and apparently anti-biotic resistant infection, and prescribed other medications to alleviate Plaintiff's pain and discomfort caused by numerous ailments.

To start, Plaintiff was not diagnosed with a kidney infection back in September of 2014. He was diagnosed with a cyst on his

kidney.  Regarding pain relief, in December of 2015, it was noted that Plaintiff was on Methotrexate, an arthritis medication, and Indocin, a pain reliever for arthritis.  Plaintiff received Ibuprofen, a pain reliever, for ten days beginning December 28, 2015.  Before the Ibuprofen prescription ran out, Plaintiff was placed on Naproxen, a medication used for pain and stiffness, for thirty days.  Before the Naproxen prescription expired, on January 20, 2016, Plaintiff was placed on Acetaminophen for pain and fever.  Thus, Plaintiff continued to receive pain relievers through February 4, 2016.  In late February, Plaintiff submitted sick calls, and Dr. Figueroa saw Plaintiff on April 1, 2016.  Dr. Figueroa prescribed Pain Off, a pain reliever, and Protonix, to limit stomach acid.  On May 7, 2016, the doctor prescribed Toradol, another pain reliever.

With respect to Plaintiff's claim that there was a failure to provide antibiotics, this assertion is belied by the medical records.  Significantly, on December 28, 2015. Plaintiff was prescribed two different antibiotics, Clindamycin (X10 days) and Rocephin.  Before this prescription ran out, Dr. Figueroa, on January 5, 2016, prescribed Clindamycin for another ten days.  Thus, this prescription would have lasted through January 17, 2016.  After a brief lapse of three days, Dr. Figueroa prescribed Cipro for a period of seven days, with the prescription ending approximately January 27, 2016.  Thus, the record shows Plaintiff

was initially on antibiotics for about a month, beginning on December 28, 2015.

Around January 23, 2016, the medical staff made concerted efforts to get Plaintiff's blood sugar levels under control once Plaintiff began suffering from nausea and vomiting after elevation in his blood sugar. Towards the end of February, Plaintiff made sick call requests, and on March 3, 2016, the nurse directed Plaintiff to the pharmacy to obtain an antibiotic when Plaintiff said he had not received it. On April 1, 2016, Dr. Figueroa recorded Plaintiff had completed his antibiotics for E. coli.

On April 7 and April 8, 2016, Dr. Figueroa prescribed Gentamycin, then re-ordered this antibiotic on April 23, 2016 (X7 days) and on April 27, 2016 (X3 days), with the prescription running out on or about May 3, 2016. On May 7, 2016, Dr. Figueroa prescribed Flagyl (X7 days), Cipro (X7 days), and Gentamycin. Thus, Plaintiff's prescription for antibiotics would have ended May 14, 2016, and he was transferred shortly thereafter, on May 23, 2016.

The record reflects that as Plaintiff's ailments, symptoms, and complaints changed, Dr. Figueroa reassessed prescribed medications and attempted to find medications and treatments for Plaintiff's infections, ailments, and pain. Although Plaintiff may not have been prescribed the medication he desired, Dr. Figueroa prescribed other medications, including pain medication. Thus,

Plaintiff "cannot establish the subjective component of his deliberate indifference claim" because there is "no evidence that [the doctors] disregarded [Plaintiff's] severe pain." Ruley v. Corr. Corp. of Am., No. 11-36-ART, 2013 WL 1815039, at *3 (E.D. Ky. Apr. 29, 2013). Upon review of the record, his treatment was not so cursory as to constitute no treatment. Indeed, the record demonstrates Plaintiff was seen almost constantly in the medical department for medical complaints and treatment, and also attended chronic illness clinics.

The fact that Plaintiff may not have been prescribed the particular drugs he desired or hoped to receive does not amount to a constitutional violation. Sears v. Thomas, No. 7:11-cv-03176-VEH-JHE, 2014 WL 4092305, at *9-10 (N.D. Ala. Aug. 7, 2014) (finding the disagreement with the efficacy of the recommended treatment or his preference for a different course of treatment does not state a constitutional claim); Ruley v. Corr. Corp. of Am., 2013 WL 1815039, at *3 (finding a physician's failure to prescribe specific medications does not constitute deliberate indifference). At most, Plaintiff has presented a claim of negligence or medical malpractice in this regard.

In Granda v. Schulman, 372 F. App'x 79, 83 (11th Cir. 2010) (per curiam), the Eleventh Circuit clarified whether a course of treatment would state a claim under the Eighth Amendment:

> Nevertheless, "a complaint that a physician has been negligent in diagnosing or

treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." <u>Estelle</u>, 429 U.S. at 106, 97 S.Ct. at 292; <u>see</u> <u>Hamm v. DeKalb County</u>, 774 F.2d 1567, 1575 (11th Cir.1985) ("Although [the prisoner] may have desired different modes of treatment, the care the jail provided did not amount to deliberate indifference."). In <u>Estelle</u>, the Supreme Court held that a prisoner failed to state a claim of deliberate indifference by alleging that medical personnel failed to diagnose and treat his back injury properly, which caused him to suffer pain for a three-month period, because he admitted to receiving treatment, including painkillers and muscle relaxants, on multiple occasions. 429 U.S. at 99-101, 106-07, 97 S.Ct. at 288-89, 292-93.

To the extent Plaintiff is attempting to raise a claim that the medical staff at SCI failed to diagnose and medically address a kidney ailment, and instead only diagnosed and treated a UTI infection, he raises a tort claim, sounding in negligence. "[M]ere negligent" misdiagnosis is not a constitutional violation." <u>Nam Dang by and through Vina Dang</u>, 871 F.3d at 1282 (quoting <u>Howell v. Evans</u>, 922 F.2d 712, 719 (11th Cir. 1991)). Therefore, even if medical staff incorrectly diagnosed Plaintiff's illness, without recognizing the onset of the kidney ailment, the medical staff saw Plaintiff and treated him for multiple illnesses, and there was no conduct exhibiting deliberate indifference to Plaintiff's medical need.

Plaintiff's dissatisfaction with his medical treatment is insufficient to sustain a claim for an Eighth Amendment violation. Here, it is quite apparent that Plaintiff is receiving extensive and

frequent medical treatment for a variety of ailments and diseases. The record demonstrates he is provided with constant and regular medical care and treatment, receives prescribed medications; attends chronic care clinics; and undergoes observation and specialized medical care in the outpatient infirmary.

To the extent Plaintiff is complaining that he should have received stronger medication or more frequent dosages of antibiotics, it has been said:

> "[W]hen a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation." <u>Waldrop v. Evans</u>, 871 F.2d 1030, 1033 (11th Cir. 1999). "Whether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations." <u>Snipes v. DeTella</u>, 95 F.3d 586, 592 (7th Cir. 1996). Ordinarily, the "failure to administer stronger medication" is a "medical judgment" that is not an appropriate basis for imposing liability. <u>Adams v. Poag</u>, 61 F.3d 1537, 1547 (11th Cir. 1995)

<u>O'Brien v. Seay</u>, No. 5:04cv228-SPM/EMT, 2007 WL 788457, at *4 (N. D. Fla. Mar. 3, 2007).

As noted before, Dr. Figueroa prescribed Cipro for Plaintiff's recurrent urinary tract infections. See <u>Johnson v. Skooq</u>, No. 5:14-cv-1217-RDP-JHE, 2017 WL 3262265, at *4 (N.D. Ala. July 12, 2017) (report and recommendation) (noting a correctional facility doctor prescribed a seven-day supply of Ciprofloxacin to treat recurrent urinary tract infections, and thereafter, another doctor prescribed Bactrim, and in granting summary judgment, finding no deliberate

indifference to a serious medical need), report and recommendation adopted by 2017 WL 3243667 (N.D. Ala. July 31, 2017), aff'd by 727 F. App'x 647 (11th Cir. 2018).

Here, even if Plaintiff's treatment were to be considered less than adequate or medical malpractice, "[a]ccidents, mistakes, negligence, and medical malpractice are not 'constitutional violation[s] merely because the victim is a prisoner.'" Harris v. Coweta Cty., 21 F.3d 388, 393 (11th Cir. 1994) (citing Estelle v. Gamble, 429 U.S. at 106). To the extent Plaintiff is claiming he should have received different modes of treatment and different medication, the record shows the treatment and medication he received does not amount to deliberate indifference. Furthermore, Defendants, through the documentary evidence, have met their burden of showing that there is no genuine issue of fact concerning whether Defendants were deliberately indifferent to Plaintiff's serious medical needs.

Plaintiff claims Defendant Hale hid the lab results from the January 2016 lab report until he turned them over to the sick call RN on or about March 3, 2016. (Doc. 62-2 at 3). Plaintiff has failed to present any operative facts to support this contention. Indeed, the record belies this assertion. It demonstrates that the lab staff sent the report directly to Dr. Figueroa, and he received the report on February 1, 2016 (Doc. 62-1 at 25). The next day,

February 2, 2016, the Medical Records department at SWC, Annex, received the report, as exhibited by the stamp.  Id.

Plaintiff's allegation that Defendant Hale denied him care for a kidney infection is unsupported by the record.  See the Affidavit of Anthony Hale, RN.[8]  (Doc. 62-5 at 1-15).  Plaintiff was not diagnosed with a kidney infection while confined at SCI; therefore Defendant Hale never denied Plaintiff treatment for a kidney infection.  Also, it is clear that Defendant Hale, at the time of the alleged events, was not a doctor or a Registered Nurse.  He could not prescribe medication and he was not responsible for the elimination of medications or addition of medications to Plaintiff's treatment plan.  At most, his role "was limited to taking patients' subjective complaints and objective vital signs and recording them in the medical record, distributing medications as ordered by the medical providers, and completing blood draws or other labs."  Id. at 3.

Although not a model of clarity, Plaintiff apparently contends Defendant Hale ran him off from sick call or purposefully lost requests for sick-call.  This vague and conclusory allegation is entirely unsupported by the record.  Plaintiff states in his response to interrogatories that he "cannot recall exact dates but I have witnesses that had witness him [Hale] running me off."  (Doc.

_____

[8] Defendant Hale is now a Registered Nurse, but at the time of the events described in the Second Amended Complaint, he was an LPN.

28

62-2 at 4). Plaintiff fails to provide the name or identity of the witnesses whom he alleges observed this alleged misbehavior or any affidavits or declarations from these witnesses, and Plaintiff completely fails to provide any operative facts to support the contention that Defendant Hale "purposefully lost" sick-call requests. Moreover, the record shows Plaintiff was constantly and repeatedly seen for his ailments and sick call requests were processed by medical staff. Although Plaintiff may not have been satisfied with the nature and speed of the responses to his requests or the treatment he received, the record shows he did receive medical care and treatment.[9] In fact, the record shows during the relevant period, Plaintiff attended chronic illness clinics, sick call, periodic screening encounters, monthly check-ups, and was even placed in infirmary outpatient observation status, as directed by the doctor.

Plaintiff focuses his complaint about the repeated loss of sick call requests to the period after he was diagnosed with an E. coli infection, on January 28, 2016, until he was seen on March 3, 2016, claiming he did not receive antibiotics to properly address this infection (Doc. 62-2 at 3). Of course, as noted above, Plaintiff

---

[9] For example, in his grievance, Plaintiff complained about an ear infection and possibly something being stuck in his right ear, and the medical staff's response of only providing ear drops and telling him to move on. This type of complaint merely presents a dispute over adequacy of treatment, not a violation of constitutional dimension. (Doc. 62-3 at 2).

was known to have recurring UTI infections, and he began receiving antibiotics on December 28, 2015, and he continued to receive them for a about a month, ending around January 27, 2016.[10]

Plaintiff's sick call requests submitted in February were received and processed by nurses (Doc. 62-1 at 31-32), with the one dated February 29, 2016, assessed as emergent, not urgent, and Plaintiff, on March 3, 2016, had a Urinary Symptoms Protocol visit and was thereafter sent to the pharmacy to obtain antibiotics (Doc. 62-1 at 33-35). As directed by the doctor, Defendant Hale began the infusion of Gentamycin on April 7, 2016 (Doc. 62-1 at 40), although Nurse Hancock was in attendance at the completion of the infusion.

There is simply no evidence in the record demonstrating Defendant Hale prevented Plaintiff's treatment or hid the lab report dated January 28, 2016 in his office. In fact, the record demonstrates otherwise. The lab sent the relevant report directly to Dr. Figueroa, and Dr. Figueroa promptly turned the report over to Medical Records, SCI Annex, the following day. The record further shows Defendant Hale did not obstruct Plaintiff's treatment for his ailments. Plaintiff was routinely and constantly seen for his numerous ailments, and although some of his ailments proved difficult to treat or resolve, particularly the antibiotic-resistant

---

[10] Dr. Figueroa ordered labs on January 23, 2016, and he received the results on February 1, 2016, confirming Plaintiff had a UTI. (Doc. 62-1 at 21, 24-26).

strain of E. coli, the record demonstrates the medical staff at SCI was not deliberately indifferent to Plaintiff's serious medical needs.

Plaintiff also claims Defendant Dr. Vilchez recklessly disregarded Plaintiff's grievance concerning deficient medical care, and knowingly acquiesced in the unconstitutional behavior of subordinates, resulting in Plaintiff suffering inordinately from an E. coli infection and JRA. The record shows Plaintiff submitted a grievance (grievance number 1603-231-009), dated February 29, 2016, addressed to the Warden of SCI. (Doc. 62-3 at 2). In this grievance Plaintiff complains he has been denied access to sick call and proper medical attention, and he states he suffered a bad diabetic attack and an ear infection. Id. Notably, Plaintiff does not mention a UTI or JRA. In the grievance, he does not identify any particular individual, but says the "R.N." discarded requests, or someone trashed requests, or someone felt free to disregard Plaintiff's quest for medical assistance, or "whoever removed the sickcall request from the sickcall box" should be questioned.[11] Id. As relief, Plaintiff asks to see the doctor concerning his medical

---

[11] It is important to note that Defendant Hale, the person Plaintiff identifies in the Second Amended Complaint as the individual who "purposefully" lost Plaintiff's sick call requests, is not an R.N. Plaintiff also referred to an R.N. in response to interrogatory #15. (Doc. 62-2 at 6). See Defendants' Motion at 18.

complaint and/or be transferred to a different institution to receive medical care. Id.

The Response to this grievance, dated March 18, 2016, is signed by the Warden, Assistant Warden, or Secretary's Representative. (Doc. 62-3 at 1). It is also signed by Defendant Vilchez (Employee Responding). Id. Although Defendant Vilchez states the HSA actually investigated the medical complaint and provided the information contained in the response, Dr. Vilchez admits he signed the response as his signature was required by the FDOC. Affidavit of Denis Vilchez, M.D. (Doc. 62-6 at 3-4). As Plaintiff urges this Court to do, the Court assumes, for purposes of this opinion, that Defendant Dr. Vilchez, at that time, was ultimately responsible for responding to the grievance, and his signature exhibits his awareness of the substance of the grievance and the content of the response. See Motion at 21-22. Even assuming this fact, based upon a review of the record, the response is correct and appropriate.

On March 18, 2016, Defendant Dr. Vilchez denied the grievance, stating:

> Investigation into your grievance reveals the following:
>
> You were seen by the MD for your medical concerns and for you CIC (Chronic Clinic) on 3/10/16 to address your medical concerns, conditions and medication needs. Access sick call as needed.
>
> Based on the foregoing your grievance has been denied.

Response (Doc. 62-3 at 1).

The medical records show, after Plaintiff filed his grievance on February 29, 2016, he was seen in the CIC on March 10, 2016. (Doc. 62-1 at 36). Thus, he received medical attention, assessment, and medication, and obtained the relief he sought. Upon review, the response provided by Defendant Dr. Vilchez certainly does not amount to deliberate indifference to a serious medical need as Plaintiff was seen by the doctor and provided with treatment and medication.

With respect to Plaintiff's grievance about his sick call requests, Plaintiff made a vague and conclusory allegation in his grievance that an unidentified "R.N." discarded the requests, disregarded the requests, or removed the requests from the sick call box. Plaintiff did not state Defendant Hale, an LPN at that time, tampered with or destroyed sick call requests or ran Plaintiff off. Thus, Plaintiff has not shown Corizon or Dr. Vilchez had any knowledge of complaints about the conduct of Defendant Hale.

To the extent Plaintiff is claiming some sort of liability because Defendant Dr. Vilchez failed to provide the requested or other desirable relief, Defendants' Motion is due to be granted. Insofar as Plaintiff alleges that his grievances and complaints were mishandled or improperly denied, such a claim does not support a § 1983 action. As this Court explained:

> Moreover, this Court agrees that [the defendant] may not be held liable on the theory of respondeat superior or on the basis that he approved the denial of Plaintiff's formal

33

grievance. <u>See</u> <u>Larson v. Meek</u>, 240 F. App'x 777, 780 (10th Cir. 2007) ("Nothing in either the original complaint or the amended complaint indicates any action or omission by [defendant] beyond his denial of [Plaintiff]'s grievances. [Defendant]'s denial of the grievances alone is insufficient to establish personal participation in the alleged constitutional violations") (citation omitted); <u>Baker v. Rexroad</u>, 159 F. App'x 61, 62 (11th Cir. 2005) (per curiam) ("Because the failure of [the defendants] to take corrective action upon the filing of [the plaintiff]'s administrative appeal at the institutional level did not amount to a violation of due process, the district court properly determined that [the plaintiff] failed to state a claim under § 1983"); <u>Shehee v. Luttrell</u>, 199 F.3d 295, 300 (6th Cir. 1999) (finding that prison officials who were not involved in an inmate's termination from his commissary job, and whose only roles involved the denial of administrative grievances or the failure to act, were not liable under § 1983 on a theory that the failure to act constituted an acquiescence in the unconstitutional conduct).

<u>Nicely v. Lagman</u>, 3:12-CV-1300-J-32JBT, 2014 WL 3721266, at *4 (M.D. Fla. July 28, 2014).

To create the required causal connection between Corizon's actions or inactions and Plaintiff's claim of an Eighth Amendment violation, Plaintiff must demonstrate that Corizon's custom or policy resulted in deliberate indifference to constitutional rights. In his Second Amended Complaint, Plaintiff fails to identify a custom or policy of refusing medical treatment, either based on cost saving measures or based on any other factor, which resulted in deliberate indifference to his serious medical needs.

In his response, Plaintiff suggests the Defendants discontinued his Methotrexate injections and other treatment for JRA "simply to deflect cost." Response at 2. Upon review, Plaintiff has failed to demonstrate Corizon had a custom or policy of refusing medical treatment based on cost saving measures which resulted in deliberate indifference to his serious medical needs. Based on the record, there is no evidence of a persistent and widespread practice of denying medications based on cost. The record demonstrates that Plaintiff has been provided numerous medications, including powerful antibiotics, but perhaps not the medication he desired or prefers. Furthermore, he has been treated for his ailments, receiving a multitude of antibiotics, pain relievers, and other medications, and has been provided with significant attention, observation, and care.

Plaintiff has not established the required causal connection between Corizon's actions or inactions and the deprivation of his constitutional rights. Additionally, Defendants Dr. Vilchez and Defendant Hale did not advance a custom and policy of saving money over providing medical treatment that avoids causing needless pain and suffering. As exhibited by the medical record, Plaintiff received a variety of treatments and medication, all in an attempt to resolve his multiple medical complaints, illnesses and infections.

The Court sympathizes with Plaintiff's plight; however, the public interest is not served by forcing physicians and other

medical staff to act outside their professional, medical judgment. In this instance, Plaintiff suffered from E. coli (ESBL), resistant to most types of antibiotics, which causes illness and infection in the elderly and is very difficult to treat, as exhibited by the multiple antibiotics prescribed and taken during the course of Plaintiff's treatment, and the rather limited effect of that treatment over an extensive period of time. Of import, Plaintiff also suffers from diabetes, arthritis, and other ailments, which certainly exacerbated his medical condition. Again, Plaintiff was provided with a variety of pain relievers and anti-inflammatory drugs in an attempt to relieve his discomfort, reduce his fevers, and to address his pain, stiffness and swelling.

There is no doubt Plaintiff had a serious medical need, the objective component. However, to satisfy the subjective component, Plaintiff must show that the Defendants acted with deliberate indifference to his serious medical need. Negligent conduct does not constitute a constitutional violation. Here, Plaintiff has failed to demonstrate Defendants' responses to Plaintiff's medical needs were poor enough to constitute an unnecessary and wanton infliction of pain. Indeed, the medical record shows Defendants' responses did not constitute an objectively insufficient response to Plaintiff's needs or conduct constituting more than mere negligence. Here, the treatment provided was not so grossly incompetent, inadequate, or excessive as to shock the conscience or

36

to be considered intolerable to fundamental fairness. Thus, Defendants' Motion is due to be granted.

Therefore, it is now

**ORDERED:**

1. Plaintiff's request for an extension of time to complete discovery, contained in Plaintiff's Response (Doc. 65 at 17), is **DENIED**. The Court previously extended discovery, and the extended discovery period closed March 26, 2018. See Orders (Docs. 56 & 59).

2. Defendants Corizon, LLC, Anthony Hale, and Dr. Denis Vilchez's Motion for Summary Judgment (Doc. 62) is **GRANTED**, and the **Clerk** shall enter judgment for Defendants Corizon Medical Group (Corizon, LLC), R.N. Hale (Anthony Hale), and Head Healthcare Officer (Dr. Denis Vilchez), and against Plaintiff William R. Ray.

3. The **Clerk** shall terminate all pending motions, enter judgment accordingly, and close this case.

**DONE AND ORDERED** at Jacksonville, Florida, this 9th day of August, 2018.

BRIAN J. DAVIS
United States District Judge

sa 8/7
c:
William R. Ray
Counsel of Record